UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION


United States of America,    )
                             )
            Plaintiff,       )
                             )
        vs.                  )    Case No. 4:05-cr-103-01
                             )
Rising Sun Irwin,            )
                             )
            Defendant.       )


TRANSCRIPT OF SENTENCING


Taken at
United States Courthouse
Bismarck, North Dakota
May 22, 2006


BEFORE THE HONORABLE DANIEL L. HOVLAND
-- UNITED STATES DISTRICT JUDGE --

<u>APPEARANCES</u>


MR. RICK LEE VOLK
U.S. Attorney's Office
220 East Rosser Avenue
P. O. Box 699
Bismarck, North Dakota 58502-0699


                                    FOR THE UNITED STATES


                - - - - - - - - - -



MR. WILLIAM D. SCHMIDT
Assistant Federal Public Defender
324 North Third Street, Suite 1
Bismarck, North Dakota 58501


                                    FOR THE DEFENDANT


                - - - - - - - - - -

GOVERNMENT WITNESSES

Page No.

Carolyn Bird Bear

    Direct Examination by Mr. Volk          6

- - - - - - - - -

DEFENSE WITNESSES

Ryan Eagle

    Direct Examination by Mr. Schmidt      18
    Cross-Examination by Mr. Volk          23

Rose Crows Fly High

    Direct Examination by Mr. Schmidt      24
    Cross-Examination by Mr. Volk          29

- - - - - - - - -

EXHIBITS

| No. | Description | Received |
| --- | --- | --- |
| 1 | Videotape of Victim Statement | 17 |

- - - - - - - - -

Certificate of Court Reporter          52

1        (The above-entitled matter came before the Court, The

2   Honorable Daniel L. Hovland, United States District Court

3   Judge, presiding, commencing at 10:04 a.m., Monday, May 22,

4   2006, in the United States Courthouse, Bismarck, North Dakota;

5   counsel appearing on behalf of the respective parties as

6   hereinbefore indicated:)

7                    - - - - - - - - - - -

8        (The following proceedings were had and made of

9   record:)

10        THE COURT:   Good morning.   We'll open the record in

11   the case entitled <u>United States of America versus Rising Sun</u>

12   <u>Irwin</u>, Case Number 4:05-103.   Could you please identify

13   yourselves for the record, please?

14        MR. VOLK:   Rick Volk on behalf of the United States.

15        MR. SCHMIDT:   Bill Schmidt on behalf of the

16   defendant, Rising Sun Irwin.

17        THE COURT:   This is scheduled as a hearing to impose

18   sentence following the entry of a plea of guilty to Count 5 of

19   the Indictment and pursuant to a plea agreement that was filed

20   back on February 15th of this year.   Mr. Schmidt, have you had

21   a chance to review the presentence report with your client,

22   Mr. Rising Sun Irwin?

23        MR. SCHMIDT:   Yes, Your Honor.

24        THE COURT:   Were there any factual disputes that need

25   to be resolved in this hearing?

4

1          MR. SCHMIDT:  No, Your Honor.  We discussed them.

2   There were a couple of inaccuracies, which I brought to the

3   attention of Mr. McGrath.  There were some changes made to

4   correct those inaccuracies, and I believe there was an addendum

5   or supplemental report filed which addressed those.  Other than

6   that, the statements that are contained in the report appear to

7   be accurate.

8          THE COURT:  Any objections to the guideline

9   calculations?

10          MR. SCHMIDT:  No.

11          THE COURT:  Mr. Volk?

12          MR. VOLK:  Neither objection to the factual

13   statements, Your Honor, or to the guideline calculations by the

14   United States, Your Honor.

15          THE COURT:  I have reviewed the defendant's

16   sentencing memorandum and the letters that were filed in

17   support thereof.  Did the Government file a sentencing

18   memorandum that I might have overlooked?

19          MR. VOLK:  No, Your Honor, we did not.

20          THE COURT:  Are there any witnesses that are going to

21   be testifying at this hearing today?

22          MR. VOLK:  Your Honor, the United States does have

23   Carolyn Bird Bear to call, and I have the videotape if we're

24   able to play it.  I'm not sure.  We seem to be having some

25   difficulties.

5

1          THE COURT:   You may proceed.

2          MR. VOLK:   Your Honor, the United States calls

3    Carolyn Bird Bear.

4                    <u>CAROLYN BIRD BEAR</u>,

5    having been first duly sworn, was examined and testified as

6    follows:

7                    <u>DIRECT EXAMINATION</u>

8    <u>BY MR. VOLK</u>:

9    **Q.**    Please state your full name.

10   **A.**    My name is Carolyn Bird Bear.

11   **Q.**    Ms. Bird Bear, you are the mother of the juvenile victim

12   involved in this case, is that correct?

13   **A.**    Yes.

14   **Q.**    You have a statement for the Court pertaining to the

15   sentencing of Rising Sun Irwin?

16   **A.**    Yes, I do.

17   **Q.**    Please proceed with that.

18   **A.**    Okay.  Your Honor, I am here today to talk to you about a

19   vicious crime committed against my daughter.  First of all,

20   Rising Sun, I want you to know that I hate you even more than

21   the first time I spoke to you.  I am filled with disgust when I

22   look at you, and I'm even angrier today with you.  I hate what

23   you did to my daughter.

24          Friday I was made aware that your mother talked to

25   someone in our community and stated what a bad parent she was.

6

1   Their opinion of her comment was shocking.  The person said she
2   and Rising Sun have no character, and she asked if they even
3   tried to apologize for your violent crime.  They were pretty
4   shocked at what she said and they were thinking, what a selfish
5   mother.  And they wondered why she was thinking about her
6   parenting skills after you're already in your present
7   circumstance.  I didn't have anything to say to this person
8   because now other parents are saying what I feel.

9        Let me take this opportunity to tell you, Rising Sun,
10  what a mother does for her children because she loves them.  A
11  mother chastises her children when they were wrong.  She
12  corrects them and never gives up on her children.  She keeps
13  and protects them safe from harm.  However, most importantly,
14  she talks to her children.  Even though they don't like to hear
15  what sometimes parents have to say, she does talk to them.  A
16  mother will risk hurting her children's feelings.  She would
17  prefer that over self-destructive behavior.  That's what I do
18  for my children.

19       And after what you did, I had the most important
20  parental challenge any parent could face.  I once had a strong
21  daughter, full of vision, full of hope, love and life.  You
22  destroyed that for some -- for a few hours of your selfishness.
23  As her parent, I'm here.  I'm here for my daughter.  I am all
24  she has.  And I went through a lot of her blaming.  I went
25  through a lot of her hurt, and I watched my baby fall apart.

1    Each time I witnessed her hurt, her falling apart, I wanted to
2    come and find you and I wanted to come and kill you.

3    You may think trying to say she was hitting on you
4    gave you an excuse to treat her the way you treated her, but
5    all it did was weaken your character and showed the monster
6    that you are.  However, as her mother, I'm here today.  I'm
7    standing to tell you that my baby is still a precious little
8    princess to me and tell you she is loved even more and not
9    destroyed.

10   She struggles, and they're still there, but she has
11   my love.  And I will always be there to protect her from you.
12   You see, I have seen her change her mind about her career and
13   see her again pull from the sadness, only to say she hopes to
14   be the best plastic surgeon that she can be.  Your evilness may
15   have tried to attack her.  You may have tried to attack her
16   soul.  The only thing was you enriched her and you made me a
17   stronger parent.  I am here today of sound mind telling you I
18   wish you could go to hell, but those are only words.

19   The Bible talks about how Jesus chastises the ones he
20   loves.  I question your mother's love for you, as I have been
21   hearing appalling reports of how your siblings are acting out.
22   If you have any influence over your siblings -- obviously your
23   mom has no influence over them -- you need to tell them to make
24   good choices.  Maybe you can try to set this example.  It's a
25   sad example that you're setting, but maybe you can reach out to

1    your siblings.

2              I have one son, and my son sometimes wants to go out.

3    He wants to hang around his buddies, but I tell him no, and for

4    a long time he would say, "Geez, everybody else gets to go out,

5    gets to go out and have fun," but when he heard about what you

6    and your three friends did to his sister, he now understands

7    why.  You see, as a parent, I have a duty to protect my

8    children.  I have to protect their character.  I have to

9    protect their honor.  I have to protect their integrity, their

10   emotional well-being and their physical well-being.  I do it

11   with love, and I don't resent my children.

12             It saddens me to think of what your dad is going

13   through, watching you here, sitting in your jail attire.  You

14   know, Rising Sun, as a parent I strive to protect my children

15   from harm and wrongdoing.  The sad thing here today is that you

16   are the harm, the wickedness that many parents are trying to

17   protect their children from.  That's what you are.  Does that

18   make any sense to you?  And you can smile.  Does it make any

19   sense to your mom?

20             You know, Rising Sun, your life will go on in prison

21   and you can think of what you -- what you've done to my

22   daughter.  And I implore you to ask yourself, was it all worth

23   it?  Humiliating a girl, was it worth sitting where you're at

24   and having your family sit where they sit?  Was all of it worth

25   it?  I can guarantee you that when you serve your time, it's

9

1   going to be either hard time or you can do something with

2   yourself.   You're a young man and you had a lot to lose and you

3   chose to lose it.   It was a horrible choice, but now you have

4   to live with what you did.

5         The flip side to that is that my daughter also has to

6   live with what you did, and so do I.   We have to live with your

7   violent memory of the person that you are and what you did to

8   her.   To this day Rebecca's grandpas, they would like to see

9   you shot and put down, like an unwanted dog, and to this day

10   they will continue -- my family will continue to support -- to

11   support my daughter.   She has her siblings, her grandmas,

12   grandpas, aunts, uncles, cousins and friends to be there for

13   her, and we will all live with the knowledge of what a

14   perverted, sick and twisted little person you've become.

15         I don't pray anymore, Rising Sun.   I don't want

16   anything good to happen for you.   If I do pray, it's negative.

17   And you know what?   I had a wonderful grandma, and my grandma,

18   she took the time to teach me to pray for everybody.   And I try

19   not to pray, and that's for the sake that I might say something

20   good about you.   That's how angry I am with you to this day.   I

21   want to tell you that my grandmas, my parents, my dad, they're

22   all very important people to me.

23         And you know, Your Honor, Rising Sun's violent rape

24   of Rebecca caused her to deal with a lot of emotions.   She

25   dealt with fear, guilt, embarrassment, anxiety, unanswered

1   questions of why her, and anger and the other things that
2   Rebecca deals with daily.  She deals with the loss of her
3   innocence, of having something private -- every one of your
4   family members, they wouldn't want themselves exposed,
5   humiliated or treated that way.  I know that.

6           She has low self-esteem.  Her outlook on life has
7   changed.  Her trust in men has changed.  Her self-respect, her
8   vision of a successful life, all these things are affected, her
9   willingness to date, her standing in her community, her
10  knowledge of sanctity that all women are entitled to, her
11  mental health, her new knowledge of a deathly hate for you.
12  She now knows how to hate.  And the thought of you being hurt
13  and suffering -- she wants you to hurt and suffer, and I don't
14  ever think my daughter has ever felt like that about anybody.

15          As her mother, I've been affected too.  I wish you
16  pain and suffering.  I wish you the same pain on a loved one.
17  I really wish that I could beat you, beat you until you die.
18  That's what I'd like to do.  I have no spirituality left, and I
19  am filled with hate and contempt for you.  The thing with
20  hating you is that you're not even worth the energy that I use
21  to hate you with.  You don't even deserve that from me.  The
22  sight of your family's presence and the knowledge that you were
23  entitled to a fair hearing and Rebecca wasn't is just unfair.
24  It is so unfair.

25          And you know, Rising Sun, I was told by a mutual

11

1    acquaintance while you were intoxicated, you were bragging

2    about what you put Rebecca through, and this person wanted to

3    fight you.  And what he told me, he said that he hopes that

4    when you get to prison, that you're treated the same exact way,

5    and he said you deserve more than jail, that you deserve to

6    lose your place in our community.  You don't deserve to be a

7    Native American.  And a lot of other people agree.

8         I was disgusted at your weakness because you did not

9    care that my daughter was drugged, violently abused and

10   multiply raped.  You were a self-centered weakling.  I only

11   have an inch of pleasure knowing that you're going to go to

12   prison.  I continue to think what a weak beast you are.  You're

13   only a mere image of a kid crying because you were, in fact, in

14   the wrong.

15        You know, Rising Sun, I can't even begin to believe

16   you chose to video my daughter, thinking you could get away

17   with violating her, thinking it was something that you didn't

18   even have to pay for in the end, thinking it was funny and

19   thinking it was something you could enjoy down the road.  Your

20   evil thought process still awes me, and I can see you have no

21   idea what you did is wrong.  What the hell you did to her was

22   wrong.  It's wrong, and I truly want to punish you as equally

23   as you hurt her.

24        Maybe you're not afraid of losing your freedom, but

25   if it were up to me, you would lose a lot more than your

1   freedom.  You would lose a little manhood you had left, and I

2   would let my brothers rape you.  It would make your damn head

3   spin.  You're very fortunate that this punishment isn't up to

4   me, and you need to be thankful of that.

5        Today there are many crimes committed against women.

6   For example, in February of 2002, in San Diego a little girl

7   who had her whole life ahead of her was raped and killed by a

8   neighbor two doors down.  My daughter was three doors down from

9   her grandma's house.  She had her whole life ahead of her, but

10  yet she was raped.  You're no different from that man.

11       Again, in Aruba a young girl was killed and raped by

12  four men.  You're no different from them either, and those --

13  but you, you four cowards, were stupid enough to tape it and

14  think your hideous actions were fun.  However, you got caught

15  by community whispers of your violent sexual behavior.  Now you

16  four hide behind your lawyers and behind your parents.

17       Your Honor, it's time for parents to be able to make

18  a stand and pray that the Courts deliver a more -- more than a

19  maximum sentence and use executorial judgment by going above

20  and beyond the sentencing guidelines.  I beg Your Honor to

21  really think this boy's sentence through.

22       In the State of North Dakota last year, there were

23  843 victims of sexual assault and 349 secondary victims that

24  law enforcement knows of.  The crime committed against my

25  daughter is a crime of violence.  It's anger.  It's control,

13

1  and it's power.  Rising Sun, you use sexual violence as a

2  weapon to humiliate, to control and to hurt my daughter.

3  Rising Sun has the potential to -- he had the potential to make

4  anyone his victim.

5        I believe Rising Sun coerced the relationship with my

6  daughter for the sole intended purpose of raping her.  Your

7  Honor, Rising Sun's active involvement with the multiple rapes

8  of my daughter demonstrates he had no intention of turning

9  himself in.  Rising Sun instead recharged his camera to

10  continue to photograph his rape.  That night Rising Sun had the

11  mind set to stop and recharge his camera, and based upon this

12  fact, I feel that his actions demonstrate to this Court he had

13  no intentions of not raping my daughter.

14        Rising Sun informed the Court he drinks a lot and

15  that's what causes his lack of judgment.  I believe there's a

16  lot more there that causes his lack of judgment.  However, he

17  had no intention to stop the multiple rapes of my daughter.  As

18  a parent, I find it difficult to believe because of this

19  statement by one of the defendants, this action clearly

20  indicates that this type of behavior is normal to Rising Sun

21  and all four of his friends, Rusty Mason, Junior; Lance

22  McClintock, and Colin Reed Hall.  You were all of sound mind

23  when you violently raped my daughter.  And you controlled her

24  and she had nobody to rescue her.

25        I ask this Court to consider Rising Sun's perverse

1   actions when it comes to sentencing Rising Sun.  Rising Sun

2   only admitted his crime of violence when he was caught.  What

3   if Rising Sun never got caught?  Would your mom continue to

4   stand on the stage singing karaoke while her son rapes more

5   women in our community?  That's a divine question, one that I

6   can't answer, but one that I deal with because this child

7   affects my family, and it affects the life of every family

8   member that Rebecca is tied to.  You need to quit lying about

9   who you are and what you are.

10          And how dare your attorney ask for leniency.  You now

11   know what you did is -- and you know what, I don't even know if

12   you know now what you did is wrong.  I don't think you know

13   that.  Let's look at your clothes.  Your violent rape is

14   appalling.  I believe you knew what you were doing.  I believe

15   your family cries because you got caught, not that you

16   committed a crime.  I don't believe that they even think that

17   you committed a crime.

18          And I am aware that my daughter made a bad choice

19   that evening, but you know what, a lot of young women in my

20   community and a lot of older women tell me she didn't ask for

21   this violent rape.  Many other women in our community have told

22   me that they partied, that they went out.  Things like this

23   never happened, and this never happened to any of them.

24          A really close friend of mine comforted me and she

25   said, "I don't believe Rebecca deserves any of this and I pray

1   those assholes go to prison, and that when they get there, they
2   get the same treatment."  I know my daughter didn't think of
3   this happening to her.  She was barely 16, Rising Sun.  She's
4   just a baby, my baby.
5         Your Honor, I have watched and battled diligently to
6   impress upon my daughter she's not a so-called whore.  However,
7   these defendants have gone to various people and told them my
8   daughter was hitting on them, and this I refuse to believe.  As
9   I indicated in earlier statements, these boys called my home
10  with the violent intention of raping my daughter.  My daughter
11  did not even know their faces or their names.
12        Your Honor, I beg that as you sentence this
13  pedophile, that you consider his violent behavior and Rising
14  Sun's lack of remorse not shown.  Your Honor, please consider
15  in his sentence that my daughter does blame herself for Rising
16  Sun's perverted, sexual, violent behavior.  Today she struggles
17  with the name calling and games played by this pervert, this
18  pedophile that sits here.
19        Your Honor, I ask you to forgive me for showing my
20  hate and my anger towards this kid.  I love my daughter.  I
21  love her a lot, and I believe that Rising Sun should receive a
22  longer sentence than ten years.  I pray to the Court for
23  15 years of imprisonment, with three years probation, community
24  service and full restitution to my insurance company.  Rising
25  Sun, this sentence is not even fit.  You deserve longer.

1        And, Your Honor, I ask that when you sentence this

2   man, this kid, that this sentence will have a stronger impact

3   on the violent multiple rapes among young children.   And

4   pedophiles like this boy here need to know that sexual behavior

5   -- sexual violent behavior isn't tolerated, and I ask that you

6   see Rising Sun for the violent, perverted pedophile and rapist

7   that he is.   And I want to thank you for allowing me to tell

8   the Court how I feel about this kid and for listening to my

9   recommendations.

10        THE COURT:   Mr. Volk, any other questions?

11   Q.   (MR. VOLK CONTINUING)  Ms. Bird Bear, your daughter

12   completed a videotaped statement as well --

13   A.   Yes.

14   Q.   -- correct?  She did that up in Minot?

15   A.   Yes.

16        MR. VOLK:   Your Honor, I have marked that as Exhibit

17   Number 1.   I'd ask that we be able to play that at this time.

18        THE COURT:   You may.

19        (Exhibit 1 was played in open court.)

20        THE COURT:   Mr. Schmidt, do you have any questions?

21        MR. SCHMIDT:   No, Your Honor.

22        THE COURT:   Okay.  You may step down.  Thank you,

23   ma'am.  Mr. Volk, does the Government have any other witnesses

24   that it wishes to call at this hearing?

25        MR. VOLK:   I have no other witnesses, Your Honor.  I

1    have other comments about sentencing, but I don't know if the

2    Court wants to move on to Mr. Schmidt's witnesses at this time.

3              THE COURT:   Mr. Schmidt, you have witnesses that are

4    here today?

5              MR. SCHMIDT:   I have a couple witnesses, Your Honor.

6              THE COURT:   You may call them at this time.

7              MR. SCHMIDT:   Thank you.   I would call Ryan Eagle.

8              THE CLERK:   Mr. Eagle, would you raise your right

9    hand, please?

10                              RYAN EAGLE,

11   having been first duly sworn, was examined and testified as

12   follows:

13                          DIRECT EXAMINATION

14   BY MR. SCHMIDT:

15   Q.   Would you state your name, please?

16   A.   Ryan Eagle.

17   Q.   Where do you live, Ryan?

18   A.   New Town.

19   Q.   And what do you do for a living?

20   A.   I'm the dropout prevention coordinator for the Boys and

21   Girls Club, and I'm the coordinator for the alternative

22   education program.

23   Q.   How long have you held those positions?

24   A.   Three years.

25   Q.   Pardon?

1    **A.**    Three years.

2    **Q.**    Are you from the New Town area originally?

3    **A.**    Yep.

4    **Q.**    And so in your context -- or in the operation of those

5    programs, have you had an opportunity to come into contact with

6    Rising Sun Irwin?

7    **A.**    Rising Sun was in the program when I started.

8    **Q.**    So about three years?

9    **A.**    Three years, yep.

10   **Q.**    And specifically what does the program provide?

11   **A.**    It's an alternative education program through New Town

12   High School and the Boys and Girls Club to provide alternative

13   education for New Town High School students.

14   **Q.**    And is that -- when kids are involved in that program, do

15   they go to the program just as if they would go to school?

16   **A.**    Right.

17   **Q.**    During the school year, primarily?

18   **A.**    Right.

19   **Q.**    And similar hours?

20   **A.**    Exactly, yep.

21   **Q.**    And ultimately they earn their high school diploma?

22   **A.**    The New Town High School diploma, right.

23   **Q.**    It's designed for kids that have difficulty in school?

24   **A.**    Right.

25   **Q.**    For various reasons, learning disabilities, other

1    psychological --

2    **A.**    With each student it's pretty different, but, yeah,

3    there's a host of reasons.

4    **Q.**    How would you describe your relationship with Rising Sun

5    during the three years you were involved with him?

6    **A.**    Good.  He was a good student in all three years that I've

7    known him.

8    **Q.**    Did you ever have any problems with him in the classroom?

9    **A.**    Not at all.

10    **Q.**    Obviously you know why you're here today and --

11    **A.**    Right.

12    **Q.**    -- why we're here today.  Could you describe your reaction

13    when you learned of the charges that Mr. Irwin has been --

14    **A.**    Obviously I was shocked.

15    **Q.**    Was that something that you would have expected him to

16    engage in based on your contact with him in the classroom?

17    **A.**    No, not that.

18    **Q.**    Have you ever seen or had occasion to deal with him where

19    he had become violent with anyone in the school setting?

20    **A.**    Not in school, no.

21    **Q.**    Male or female?

22    **A.**    No.

23    **Q.**    Are there females in the classes that you conduct?

24    **A.**    Yes, there are.

25    **Q.**    Were there females in the classes that he participated in?

1  **A.**    Yes.

2  **Q.**    How would he interact with the females that were in the

3  same classes?

4  **A.**    Normal, respectful, and he never did anything towards

5  either male or female that was disrespectful in school.

6  **Q.**    Before he was arrested, where was he in the scheme of

7  things as far as completing his --

8  **A.**    He was a junior.

9  **Q.**    Junior?

10  **A.**    Yep.

11  **Q.**    And assuming he had not been arrested, when would he have

12  been expected to --

13  **A.**    He should have -- he should have graduated this May.

14  **Q.**    You mentioned that he was respectful.  What other -- any

15  other observations that you would have had with him or about

16  him?

17  **A.**    He never -- we never had a problem with him at all in the

18  school all three years.  Rising Sun was one of the students

19  that once we told him something, he always did it.  I mean, I

20  don't know.  He just -- we never had problems at all with him.

21  **Q.**    So if he was given a task or told to do something, he

22  would follow through?

23  **A.**    Yeah.

24  **Q.**    That isn't always the case with students.

25  **A.**    Right.

1   Q.    Any problems with disciplining with him when he was in the
2   school setting?
3   A.    Not at all, no.
4   Q.    Are kids terminated from the program or expelled from the
5   program if they're --
6   A.    It's pretty hard to be terminated from our program.
7   Q.    Pardon?
8   A.    It's pretty hard to be terminated from our program.  It's
9   kind of the last thing for most students, so no.
10  Q.    Sure.  How was it that he became involved in the program?
11  A.    Like I said, he was in the program when I started, so he
12  was referred by the principal -- New Town High School principal
13  to our program.
14  Q.    Are kids referred to it because they've had disciplinary
15  problems in the school, or is it primarily educational
16  difficulties?
17  A.    Educational difficulties primarily.
18  Q.    So the fact that he was referred from the -- what I'll
19  call the normal high school to your program doesn't indicate,
20  at least to you, that he was a discipline problem or had
21  difficulties interacting with students or faculty --
22  A.    No.
23  Q.    -- in high school.
24  A.    No.
25  Q.    No indication of that at all.

1  **A.**    No indication of that.

2  **Q.**    Have you visited with him at all since he's been in

3  custody?

4  **A.**    I and a couple of our students, we went to -- when I saw

5  him, he was in detention center in New Town, for like ten

6  minutes or so, but --

7  **Q.**    Very limited?

8  **A.**    It was just, yeah, very limited.

9  **Q.**    So you've not interacted with him about the charges and

10  the effect it's had on him?

11  **A.**    Not at all.  We didn't talk about the charges at all.

12          MR. SCHMIDT:  That's all I have, Your Honor.

13          THE COURT:  Mr. Volk, any questions?

14                    <u>CROSS-EXAMINATION</u>

15  <u>BY MR. VOLK</u>:

16  **Q.**    Mr. Eagle, when did Mr. Irwin last participate in the

17  program?

18  **A.**    Let's see.  It was last semester.  December, I believe.

19          MR. VOLK:  That's all I had, Your Honor.

20          THE COURT:  Anything else, Mr. Schmidt?

21          MR. SCHMIDT:  No, Your Honor.

22          THE COURT:  Thank you, sir.  You may step down.

23          MR. SCHMIDT:  I would call Rose Crows Fly High.

24          THE CLERK:  Would you raise your right hand, please?

25

1                          <u>ROSE CROWS FLY HIGH,</u>

2    having been first duly sworn, was examined and testified as

3    follows:

4                          <u>DIRECT EXAMINATION</u>

5    <u>BY MR. SCHMIDT</u>:

6    **Q.**    Would you state your name, please?

7    **A.**    Rosemary Crows Fly High.

8    **Q.**    And, Rose, where do you live?

9    **A.**    I live in New Town.

10   **Q.**    And you are Rising Sun -- you're Rising Sun's mother, is

11   that correct?

12   **A.**    Yes.

13   **Q.**    You've been present in both court proceedings and heard

14   the comments of Ms. Bird Bear, have you not?

15   **A.**    Yes.

16   **Q.**    Do you have children other than Rising Sun?

17   **A.**    Yes.  Rising Sun is my oldest, and then I have a daughter.

18   Her name is Denise Nicole.  She's 17.  My other daughter, her

19   name is Red Feather.  She's 16.  And then I have a son whose

20   name is Eagle Scout, and he -- he's 12.

21   **Q.**    Could you tell the Court what your reaction was when you

22   learned that your son had been charged with this terrible

23   offense?

24   **A.**    At first I was kind of in shock.  I didn't know what to

25   think, and I had a lot of emotions that I went through.  My

24

1   children went through them with me too.  It's like a lot of

2   emotions, every type of emotion I could go through.

3   **Q.**   Given the fact that you have a teenage daughter, I assume

4   you can understand the feelings that Ms. Bird Bear expressed

5   with respect to her daughter.

6   **A.**   Yes.  I have two teenage daughters.  I try to put myself

7   in Ms. Bird Bear's place and think of how I would be reacting,

8   but a lot of times I did a lot of praying, a lot of praying for

9   every individual that was involved in this.

10  **Q.**   Rising Sun has had some difficulties in the past in the

11  tribal courts, has he not?

12  **A.**   Yes.

13  **Q.**   And in most of those instances alcohol has been involved,

14  is that correct?

15  **A.**   Yes.

16  **Q.**   Do you believe that Rising Sun may have an alcohol problem

17  that needs to be addressed?

18  **A.**   Yes.  In the past, the trouble that he's -- when he did

19  get into trouble, it was always alcohol-related and

20  drug-related, but when he wasn't using alcohol or drugs, he was

21  a very good kid.

22  **Q.**   There's been some suggestions that Rising Sun may have

23  been involved in other activities -- similar other activities.

24  Are you aware of anything other than what he's facing today,

25  that he's ever been involved in something like this before?

1  **A.**    No.  I've always talked to my son about -- he's the

2  oldest, and he had to set like an example for his brothers and

3  sisters.  And when he wasn't using drugs or alcohol, he always

4  did that.  He always watched over his siblings.

5  **Q.**    You had provided me with some information indicating that

6  he was diagnosed at a rather young age with attention deficit

7  disorder, is that correct?

8  **A.**    Attention deficit disorder with hyperactivity.

9  **Q.**    Was he taken -- or was he expected to be taking

10  medication?

11  **A.**    He was diagnosed when he was, I believe, four or five

12  years old, and he was on his medication up until, I think,

13  around 14, 15 years old.

14  **Q.**    Did he go off -- the doctors didn't feel he needed to

15  continue taking it?

16  **A.**    No, he went off himself.

17  **Q.**    That was probably not a good thing.

18  **A.**    No.

19  **Q.**    When he takes his meds or when he takes the prescriptions

20  that are set out for him, does he -- does he do better?

21  **A.**    Yes.  My younger son is diagnosed with the same attention

22  deficit disorder, and when he's not on his medication, you can

23  see the difference.  It's like night and day.

24  **Q.**    I assume you've had an opportunity to talk with your son

25  since he's been in custody about the charges that he's -- that

1   are filed against him.

2   **A.**   Yes.

3   **Q.**   What's your sense as a mother as to how this has affected

4   him and how he feels about it?

5   **A.**   When he was growing up, I've always did my best to try to

6   raise my kids because I'm a single parent mother.  I've raised

7   my kid without any financial support from their father.  They

8   don't have contact with him or he doesn't contact them, but

9   speaking with Rising Sun, he knows he did wrong and he's sorry

10  for it.  And, you know, as parents we can only do our best to

11  raise our children and talk to them in a good way, but when --

12  it's up to them, I guess, to make the right choices.

13  **Q.**   As a parent, I would expect that this is a typical

14  reaction.  Have you had time to reflect and question yourself

15  as to where you went wrong, what you may have done that may

16  have resulted in this?

17  **A.**   Yes.

18  **Q.**   Have you told people that?

19  **A.**   No.  I have one very close friend that I work with, and

20  basically that's who I talk to.  And then I talk to my brothers

21  about, you know, things because my brothers and my sister are

22  very close.  There's only four of us in our family.

23  **Q.**   As far as school is concerned, Mr. Eagle indicated that he

24  did reasonably well while in school as far as behavior and

25  progressing as he should.  Are you aware of any problems that

27

1  he had in school as far as, I guess, assaultive kind of

2  behaviors towards other students, particularly female students?

3  **A.**   No.   No.   Every time he did something good in school, he

4  would come back and tell me what -- you know, if they went on a

5  field trip, he would come and tell me, you know, things that

6  they done and activities.

7  **Q.**   You understand, obviously, that your son is going to face

8  consequences as a result of what occurred.

9  **A.**   Yes.   I thought a lot about that, and I believe that this

10 is happening for a reason and that maybe this is a blessing in

11 disguise because if my son was still out continuing to use

12 drugs and alcohol, maybe I would have been burying him.

13 **Q.**   His consumption usage was increasing or to a point where

14 you were concerned he was going to hurt himself?

15 **A.**   Yeah.   That night I would worry about -- like every other

16 mother, you worry about your kids if they're not home, and this

17 is when I think that maybe I would have buried my son by now or

18 maybe -- maybe something terrible would have happened to him.

19 **Q.**   Do you believe that he needs and can benefit from

20 intensive drug and alcohol treatment?

21 **A.**   Yes.   Yes.

22 **Q.**   As far as time in custody, do you believe he could benefit

23 from any education and vocational training that he might get?

24 **A.**   Yes.

25          MR. SCHMIDT:   That's all I have, Your Honor.

1          THE COURT:   Mr. Volk, any questions?

2                          CROSS EXAMINATION

3    BY MR. VOLK:

4    **Q.**    Ms. Crows Fly High, your son has been through treatment a

5    number of times in the past, hasn't he?

6    **A.**    Yes.

7    **Q.**    What's been the problem?  Why has he kept continuing to

8    use alcohol and drugs since then?

9    **A.**    When the two times that he went through treatment, he

10   returned back to New Town, and some of the outpatient that he

11   was supposed to go through, I took him, and a lot of times the

12   workers at that Circle of Life program in New Town were either

13   on travel or -- and there was a lot of times where they

14   canceled his outpatient treatment therapy.  And then, you know,

15   with all the alcohol and drug factors on the reservation, it's

16   really easy to slip back into that kind of behavior again.

17   **Q.**    Do you think anything is going to change for him?

18   **A.**    Excuse me?

19   **Q.**    Do you think anything is going to change for him?

20   **A.**    Yes, I do.

21   **Q.**    Why?

22   **A.**    Because with his -- with what he has now, his -- the

23   mental -- or that attention deficit disorder, those type of

24   kids have to be in a structured -- like a structured setting.

25   Everything has to be structured for them, and that's how he was

1    when he was growing up.  I had to structure everything for him,

2    schedule, everything.  And with my younger son, the same thing

3    there.  Everything has to be structured for them.

4    **Q.**    Jail may actually be a good thing for him?

5    **A.**    Yes.

6              MR. VOLK:   That's all I've got.

7              THE COURT:   Mr. Schmidt, anything else?

8              MR. SCHMIDT:   Nothing further, Your Honor.

9              THE COURT:   Thank you.  You may step down, ma'am.

10             MR. SCHMIDT:   Your Honor, I don't have any further

11   witnesses.  Rising Sun does have a statement that he wishes to

12   make to the Court.  I obviously want to comment on the

13   sentencing issue, but I don't know if this would be the

14   appropriate time for Mr. Irwin to make a statement to the

15   Court.

16             THE COURT:   No, I'll give Mr. Volk, on behalf of the

17   Government, the first opportunity to make a recommendation for

18   a sentence in this case.

19             MR. VOLK:   Your Honor, the guideline range in this

20   case is 168 to 210 months based on the presentence report.  The

21   maximum penalty is, of course, ten years or 120 months.  We are

22   recommending the 120 months of imprisonment.  We are further

23   recommending the restitution.  $385.58 is what's listed in the

24   presentence report.  We are asking that be joint and several.

25   There was -- as Ms. Bird Bear indicated, her insurance company

1   did pay out quite a bit of money above and beyond that.

2   Unfortunately, it's not calculated out in there, but the

3   insurance company has paid extra money.

4           We are further recommending a three-year term of

5   supervised release above and beyond the maximum penalty in this

6   case.  I know that Mr. Schmidt has asked the Court to sentence

7   Mr. Irwin to less than the maximum penalty in this case, but I

8   think there are a number of reasons why it is appropriate in

9   this case.

10           Based on my review of the presentence report in this

11  case, the defendant is the one who really set the wheels in

12  motion here.  He's the one that made the initial contact with

13  the victim.  He's the one that began the drinking that

14  initiated this matter.  He's the one that initiated the sexual

15  activity in this case.  He admitted engaging in intercourse

16  with the victim before the videotape took place.

17           He's the one who obtained the videocamera.  He's the

18  one who videotaped the incident itself.  While he may not have

19  been the primary actor involved in the things that are depicted

20  on the videotape itself, I think it's clear just watching and

21  listening to that video, that he was directing and encouraging

22  what went on in there.  Also I'm taking into account that he

23  did, in fact, show this videotape to some of the others, as is

24  indicated in the presentence report.  I think that shows that

25  he was proud of his conduct, of what he did, that he had no

31

1  remorse, and that essentially he was revictimizing Ms. Bird

2  Bear once again.

3          Part of the reason that we are dealing with the

4  crimes that these various defendants have pled guilty to and

5  the sentencing recommendations are because the victim in this

6  case was having a very difficult time with this case and

7  certainly did not want this videotape to be shown to members of

8  the public, Your Honor, so that certainly has factored into

9  this.

10          I think Carolyn Bird Bear's comments are more than

11  sufficient to describe the amount of damage that this has done

12  to her, to her family members.  It's just one of the most

13  outrageous things that has come across in front of this Court.

14  And looking at what's on this videotape in respect to whether

15  Mr. Irwin should receive the maximum penalty or not, he is the

16  one that used the lighter to burn Ms. Bird Bear during the

17  course of this.  And I think that's one of the most violent,

18  sadistic acts that's portrayed on this videotape.  Certainly is

19  something that needs to be taken into account.

20          I know he has many letters of support from his family

21  that tell the Court that he's very respectful of women.  I

22  think it's hard to believe that anyone who would see this

23  videotape would come to that conclusion at all.  Certainly

24  depicts something completely of the opposite.

25          And the Court needs to take into account the

1    defendant's conduct since this offense took place as well.

2    This offense took place in August of 2005.   And the defendant's

3    conduct since then has been less than encouraging to think that

4    he's taken this matter seriously in any event.   And while you

5    may attribute it somewhat to an addiction to alcohol, he had a

6    minor in consumption in September, on September 13th of 2005,

7    just a few weeks after the offense conduct happened.   He had a

8    fleeing, a resisting arrest, a weapons charge and a simple

9    assault in November, a couple of months later in tribal court,

10   and then he's charged in this case.   He made his appearance,

11   and he had an additional drinking episode, minor in

12   consumption, minor in possession on January 22nd of 2006, which

13   resulted in the revocation of his release in this case.

14          Even when he's facing what he knows to be a long jail

15   sentence, he kept on going.   And I just -- it's just amazing,

16   given what he was facing, his knowledge of that, that he would

17   continue to engage in alcohol consumption.   And he's only 19,

18   certainly not even legal for him to do so outside of the fact

19   that he had a Court order not to do so.   I think given all of

20   those things, Your Honor, that Mr. Irwin is well deserving of

21   the ten years, and that is why we are making that

22   recommendation, Your Honor.   Thank you.

23          THE COURT:   Mr. Schmidt.

24          MR. SCHMIDT:   Your Honor, to stand before you and

25   suggest that the underlying facts of the incident here are not

1    heinous and egregious and terrible would be -- if I were to do

2    that, any credibility that I might have had or generated with

3    the Court would be out the window.  This -- I would agree with

4    the Government's observations, the videotape that I think most

5    folks in this courtroom have seen is very graphic and it's

6    reprehensible, and for that Mr. Irwin should be punished, and

7    should be punished appropriately and reasonably.

8           I guess the question then becomes one of what is

9    reasonable.  I'm certainly not surprised and did not expect the

10   Government to recommend anything less than the statutory

11   maximum, and under a lot of circumstances I might be inclined

12   to go along with that.  There's a lot of anger in this room

13   today, understandably.  Ms. Bird Bear said some very sincere

14   things, but the anger is there and it probably isn't going to

15   go away.  Unfortunately, I don't believe that this Court -- and

16   I'm sure this Court will not be motivated by anger.  There

17   needs to be a punishment.  There needs to be retribution, but

18   there needs to be a look at the entire set of circumstances.

19          I have a daughter, not a teenage daughter any longer.

20   I know the Court has a daughter, and I certainly would not want

21   my daughter to be treated any way similar to what happened to

22   Ms. Bird Bear's daughter, but I don't think you can lose sight

23   in imposing sentence of what -- what we have here with

24   Mr. Irwin.

25          One of the reasons that I am suggesting the Court at

34

 1    least consider something less than the ten years is what I
 2    understand the likelihood of penalties that may be imposed on
 3    the other individuals involved.  I recognize that two of them
 4    have not yet to appear, but one of them is a juvenile, and the
 5    juvenile, as I understand it, simply because of his age, is
 6    going to present some limitations to this Court as far as what
 7    can or can't occur.  I don't think that's insignificant.  The
 8    fact that he was 17 and Mr. Irwin was 8 months past his 18th
 9    birthday, to suggest that the juvenile get a period of
10    detention of maximum up to age 21 and requiring Mr. Irwin to
11    serve three, four times that amount I think is a disparity that
12    this Court has to factor in in determining the sentence.
13         As the Court knows, the guidelines, you know, in this
14    instance probably don't apply because of the statutory maximum.
15    You have to look, I believe, at 3553(a).  And 3553(a)(6) talks
16    about unnecessary or unwarranted disparities, and I think if
17    you look at how the other three individuals are going to be
18    treated in relation to what Mr. Irwin is facing, I think that
19    disparity is significant.
20         Mr. Volk would suggest that even after this event
21    happened, that Mr. Irwin continued to use alcohol and to
22    continue to get in trouble, and he can't understand how that
23    could be.  Well, I can give you one very simple explanation.
24    He's addicted.  He's got an addiction problem that hasn't
25    properly been addressed, and that needs to be addressed.  The

1    fact that somebody is charged or potentially going to be in

2    very serious trouble and continues to consume alcohol clearly

3    indicates that that person has got an addiction.   That doesn't

4    make the conduct right.   It doesn't justify it, but it

5    certainly explains it and I believe is somewhat mitigating.

6          We've got another situation here that, you know, an

7    individual who has no prior record of violence towards anybody,

8    and while it may be suggested that somebody told somebody this

9    or somebody told somebody that, I think the Court has to look

10   long and hard at the eval. that Dr. Kehrwald did.   There's a

11   professional.   He doesn't have any axe to grind with regard to

12   anybody here.   And as I read his report, he certainly

13   recommended that Rising Sun get treatment for the offenses and

14   his conduct.

15         But he basically concludes that he's a low risk of

16   reoffending.   I've never seen a psychological eval. that says

17   there is no risk of offending, but he's a low risk.   In fact,

18   he goes so far to suggest that if it were appropriate, he could

19   be treated on an outpatient, in a community-based setting.

20   That suggests to me that he is not the violent threat that

21   perhaps the victim's family believes.

22         His teacher, who's been with him for a couple of

23   years, indicates that there's been no indication of violence,

24   assaultive kind of behavior towards males or females.   And to

25   suggest that this is a pattern or this is a situation that he

36

1   finally got caught, I just don't think the record bears that

2   out.

3          There are going to be consequences that follow this

4   young man around for the rest of his life regardless of what

5   you impose.  He'll have to register as a sex offender, and that

6   doesn't -- that's not an easy label to have, and depending on

7   how and the officials, wherever it is he choose to live handle

8   it, may or may not result in additional publicity that will

9   follow him the rest of his life, so whether he gets five years

10  or ten years and three years of supervised release, it's not

11  going to go away for Mr. Irwin.  It's going to be there, and he

12  understands that.

13         Certainly the drug and alcohol issue is there, and

14  does he need it, treatment?  Absolutely.  I would want the

15  Court -- ask the Court to include a recommendation that he be

16  considered for placement in the BOP's RDAP program, but as the

17  Court knows, he's not going to get any time benefit for that.

18  This is a crime of violence.  BOP doesn't allow persons to earn

19  additional good time if they successfully complete it.  That, I

20  think, is another reason or at least factoring in in

21  determining whether or not to impose the statutory maximum.

22         As I indicate, Your Honor, I think that this is truly

23  an aberration.  It's a terrible, terrible situation.  When

24  confronted, he did produce the video.  I mean, he didn't go

25  running to the police when this happened.  There's no question

1   about it, but when he was confronted, the video was produced to

2   the FBI, and it's awful.  It's truly awful, and I think my

3   conversations with Rising Sun, he's kind of a reserved kid.

4   He's not real conversant, but there's no doubt in my mind that

5   he understands the wrongfulness of his conduct and that there

6   are consequences that are going to flow from it.

7           But to saddle the young man with a ten-year sentence,

8   when had he been as young as the juvenile, we would be having

9   an entirely different situation, I think creates a significant

10  disparity that at least you must take into account in imposing

11  sentence.   I think something less is appropriate, certainly

12  enough to deter, certainly enough to punish.   Certainly can

13  include enough conditions in addition to those that will follow

14  to ensure that this is not likely to happen again.   I don't

15  think it will.

16          Mr. Irwin, if he takes his meds, if he gets the

17  appropriate treatment and follows the recommendations that are

18  made for him, I honestly think can become a productive member

19  of society.   We don't know.   If we knew that, if we could look

20  in a crystal ball and project 10 or 15 years down the road what

21  people are going to do, it would make all of our jobs a lot

22  easier, but I think when you look at everything as a whole, I

23  think the justification for a departure to a sentence -- or a

24  sentence less than the statutory maximum is appropriate.

25          Mr. Mason, as I understand, got 18 months.   My

1  understanding is that there's a possibility Mr. Hall may get
2  probation.  And as I indicate, my understanding is the
3  juvenile, if he admits and is sentenced, probably is limited to
4  detention to age 21, assuming he doesn't screw up while in
5  detention.  So when you look at those in comparison to what
6  Mr. Irwin is looking at, I don't know that that's appropriate.
7        While he may have, as Mr. Volk suggests, been the
8  person who put things in motion, the videotape, at least from
9  my recollection, is pretty explicit, that the juvenile was far
10 and away the most active participant, and he's looking at a
11 relatively short period of time.  So again, I think you need to
12 balance those.  I'm not condoning either one of the conducts,
13 but more importantly looking at it from a standpoint of factors
14 that you need to look at for sentencing.  I'm certainly not
15 going to tell the Court -- give the Court a number.  I think
16 something less than the ten years is appropriate and certainly
17 would be a reasonable sentence given what we have here and what
18 is in the report.  Thank you.
19        THE COURT:  Mr. Rising Sun Irwin, at a sentencing
20 hearing like this I need to give you an opportunity to say
21 something relative to the sentence to be imposed or any other
22 matters pertaining to this case.  I have read the sentencing
23 memorandum provided by your attorney.  I have read all of the
24 letters that were provided with that sentencing memorandum.
25 I've read them all twice, but I want to give you an opportunity

1    to say something, and you are free to speak.  If you have a

2    written statement, you may read it.  If not, you may speak at

3    this time, if you could pull the microphone close to you too.

4         THE DEFENDANT:  I, Rising Sun Irwin, take full

5    responsibility for my actions and my violations that I

6    committed.  I am young and have a serious addiction for alcohol

7    and drugs.  I plan on getting help for my addictions so nothing

8    like this will ever happen again in the future.  I know what I

9    did was wrong and I'm sorry from my heart.  I'd give anything

10   to take back what I did.  My family taught me well, but I

11   didn't listen to them.

12        To the person I probably hurt the most, I am sorry.

13   I wouldn't have did anything if I wouldn't have drank that

14   night, stayed home, or hung around any of my friends that day.

15   I can't give much but to let you know that I am sorry and never

16   meant to hurt you, so please accept my apology.  I will learn

17   from this, but I plan on being something in my life.

18        My friends are a bad influence on me and I should

19   have respected my family and listened -- listened to what they

20   tried to tell me and stay away from them.  Instead at the time

21   alcohol and drugs made me make some bad choices that I cannot

22   change now, so now I have to live with the stupid choice for

23   the rest of my life.

24        I intend on getting special help for my addictions.

25   I am sorry.  That's all I can give or say to the person I hurt.

40

1    I know what I did was wrong.  I'm sorry, but alcohol was there,

2    and that's all.

3              MR. SCHMIDT:  Your Honor, I would make this part of

4    the Court's record.

5              THE COURT:  Mr. Schmidt, anything else that you would

6    like to say?

7              MR. SCHMIDT:  No, Your Honor.

8              THE COURT:  The Court does adopt the factual findings

9    and the sentencing guideline calculations set forth in the

10   presentence report.  Presentence report established a total

11   adjusted offense level of 35, with a criminal history category

12   of one.  Neither party noted any objections to the guideline

13   calculations in this case.

14             Under the advisory guidelines, that provides for a

15   period of imprisonment ranging from 168 to 210 months, period

16   of supervised release up to five years.  There is a statutory

17   maximum sentence of 120 months or ten years in this case, so

18   the sentence recommended by the advisory guidelines has no

19   application in this particular case.

20             I am aware of my authority to depart under the

21   guidelines and my authority to depart under Section 18 USC

22   3553(a).  I have carefully considered all of those factors set

23   forth in 3553(a), and I am not going to depart in this case

24   from the statutory maximum or impose a nonguideline sentence

25   under 3553(a).

1      If it was my choice in this case, I would have

2  sentenced everyone that was involved in this chaos to ten-plus

3  years in federal prison, but my hands are tied by the charges

4  that were filed, by the plea agreements that were reached.

5  There's one individual that's a juvenile.  My hands are tied

6  relative to the sentence to be imposed in that case, but I

7  would have imposed ten-plus years to everybody that was

8  involved in the chaos that went on and the videotape that was

9  played that evening.

10      I have reviewed that videotape.  It's about 20 or

11  25 minutes long.  I don't know what went on before the

12  videotape was taken.  I don't know what went on after the

13  videotape was taken, but I can assure you that if anybody in

14  this courtroom saw that videotape, they would want 20-plus

15  years in federal prison for those that were involved.  Every

16  one of the people that were involved deserves to be

17  incarcerated for a lengthy period of time, from what I saw in

18  that videotape.  It's hard to believe that anybody would treat

19  a young helpless female like that.

20      And I've read in some of the reports that she was

21  hitting on individuals and she was coming on to individuals

22  that evening.  That -- I can assure you that wasn't the case.

23  What was depicted in the videotape midway through the evening

24  is a young helpless woman who was semiconscious, who was

25  incapable of resisting, incapable of consenting, incapable of

42

1    hitting on anybody.   And you don't have to watch that videotape

2    but five minutes to realize that this young lady could not have

3    done anything that evening.   She laid there while people poured

4    booze down her throat and did a whole host of other terrible

5    things to her that were absolutely despicable, incapable of

6    consenting to anything that went on that evening.

7            And to suggest that she was doing things to other

8    guys or was hitting on people or coming on to them is so far

9    from the truth that it's unconscionable to even suggest that.

10   And she obviously had some knowledge of what was going on to

11   her but she was incapable of resisting.   She reacted when she

12   was burned in the genital area.   She tried to push hands away.

13   She tried to resist as much as she could resist, but she was

14   incapable of providing any resistance whatsoever.   There was no

15   common sense.   There was no respect towards women.   There was

16   no compassion at all that was shown by anyone that was involved

17   that evening, from what I could see.

18           And again, I don't know what went on before the

19   video, but what I do know is that Mr. Irwin had sex with her

20   before the video was shown.   That's been admitted, and I don't

21   know who else had sex with her.   Nobody else has had the

22   courage to admit that, but I'm -- as I've indicated before in

23   one of the other sentencing hearings, I'm not naive enough to

24   believe that somebody else didn't have sex with that girl

25   before the videotape was taken.   I'm confident that someone

43

1   else did, but we only know of Mr. Irwin admitting to that.

2   And ten years is a long time, but I can tell you that

3   I've run this case by a whole host of people of all ages, all

4   sexes, all races.  I haven't shared with them the names of

5   those who were involved.  I haven't told them anything other

6   than what I saw in the videotape.  I haven't run into anybody

7   that's felt that anything less than 10, 15, 20 years would be

8   appropriate for everybody that was involved in there.

9   Nobody -- the conduct of others, including Mr. Irwin

10  and the juvenile involved, were pretty egregious.  And the

11  conduct of some of the others was not as egregious as that, but

12  nobody stepped forward to try to prevent anything that was

13  happening.  I think everybody is equally to blame for what

14  everybody thought was a real fun evening of entertainment.

15  And I've been concerned about the disparity in

16  sentence -- in the sentences to be imposed in this case, and I

17  thought long and hard about that and it is troublesome to me,

18  but my hands are tied as far as the sentence that can be

19  imposed on all of those four individuals.  As I indicated, so

20  much depends upon the charges that were filed, the plea

21  agreements that were reached, the statutory maximum penalties,

22  the penalties that can be imposed on juveniles.  Like I said,

23  if it was my choice, it would be ten-plus years for everybody,

24  but I can't do that.

25  Pursuant to the Sentencing Reform Act of 1984, it's

44

1   my judgment, Mr. Rising Sun Irwin, that you shall be committed

2   to the custody of the Bureau of Prisons, to be imprisoned for a

3   period of 120 months or ten years.  That's the statutory

4   maximum.  I've carefully reviewed the presentence report.  I've

5   read every letter that's been sent to me in this case by family

6   members and friends.  I've considered all of the factors that

7   I'm required to consider under 3553(a).

8        The conduct in this case was outrageous, and to me,

9   Mr. Irwin, you picked her up that evening, although you

10  originally deny that.  You had sex with her before the

11  videotape was played.  You encouraged others in that trailer

12  that I saw.  You made the brilliant decision to videotape this,

13  and then went on to show it to others the next day.  The

14  taunting, the abuse, the assaults that I saw deserve a long

15  sentence, and it's going to be a rare occasion that I'm going

16  to depart and impose a nonguideline sentence or depart from the

17  advisory guidelines in cases involving sexual assaults and

18  sexual abuse of young women like this.

19       Upon release from imprisonment, the defendant shall

20  be placed on supervised release for a term of five years.

21  While on supervised release, you'll be required to comply with

22  a number of standard conditions that are imposed on all

23  defendants.  Essentially requires that you comply with all

24  federal, state, local laws, tribal laws.

25       You can't use illegal street drugs.  You can't hang

1   around those that use illegal street drugs.  There's about 10
2   or 12 standard conditions that are imposed on everyone, and
3   they'll be set forth in what's called a judgment, which is a
4   document that I'll sign today.  And you'll get a copy of that,
5   sir, and all of those conditions will be reviewed with you by a
6   probation officer before you're released from custody.

7          And it also includes a provision that you cannot use
8   or possess firearms, and I would urge you to be careful about
9   that too because we see a number of cases in federal court
10  where persons convicted of felonies are in possession of
11  firearms and may be in a car or an apartment or a home they're
12  living in and they don't even know about it, but they get
13  charged with those offenses, and they carry pretty severe
14  penalties in the federal system.

15         In addition, the Court would impose the following
16  special conditions that will be a part of the five-year period
17  of supervised release.  First of all, you'll be required to
18  participate in psychological, psychiatric counseling and sex
19  offender counseling.  That type of programming should be
20  available to you in the federal system, but if it isn't and you
21  don't take part in it, that will be something that the
22  probation officer can require that you take part in upon your
23  release from custody.

24         Secondly, you'll be required to grant a waiver of
25  your right of confidentiality in any medical records.  In other

46

1   words, you'll have to sign a release of any -- and allow the

2   probation officer to review any of your medical, psychiatric

3   records so that he or she can monitor your treatment and to

4   determine whether you're complying with all of the

5   recommendations of those that are providing treatment and

6   counseling to you.

7         Third, you'll be required to register with the state

8   sex offender registration agency in any state where you reside,

9   where you're employed, where you're going to school.  There's a

10  mandatory requirement in virtually all states that I'm aware of

11  that require sex offenders to register, and that is a

12  requirement that will be imposed upon you in this case.

13        Fourth, you'll be required to submit your person to a

14  search at any time, any place by a federal probation officer if

15  he or she believes that you're violating some condition of your

16  supervision.  That's a standard search clause provision that's

17  imposed upon most convicted felons.  That provides that you'll

18  be required to make yourself available, your automobile,

19  computers, where you work, where you live, where you play.

20  Virtually anything that you own is subject to a search --

21  random search by a probation officer.

22        The next condition -- special condition is that the

23  defendant shall abstain from the use of alcohol and use of

24  illegal drugs during this five-year period of supervised

25  release, and you'll be subject to random substance abuse

47

1    testing.

2          The Court will not order a fine in this case.  I do

3    need to order that you pay a special assessment of $100.

4    That's a mandatory fee for each count that one pleads guilty

5    to, and you pled guilty to Count 5, I believe it was, of the

6    Indictment, so that's how we reach this $100 figure.  The Court

7    will also order restitution in the amount of $385.58, joint and

8    several with the other defendants in this case.

9          I am recommending, sir, that you be placed in a

10   facility where you can take part in the Bureau of Prisons

11   500-hour drug abuse treatment program.  It's called RDAP.  It's

12   a 500-hour, nine-month program.  It's their most successful

13   drug/alcohol treatment program offered in the Bureau of

14   Prisons.  They have a very low recidivism rate among those that

15   successfully complete the program.

16         In other words, there's few that complete the program

17   that start using again when they are released from custody, and

18   I would urge you to take advantage of that.  There's about 55

19   of the 115 facilities operated by the Bureau of Prisons where

20   they make that program available to inmates, and I am

21   recommending that you be allowed to participate in that

22   program.

23         I do need to inform you, sir, that you have a right

24   to appeal anything that I've ordered here today.  You have a

25   right to appeal the sentence.  You have a right to appeal the

48

1    conditions that have been imposed upon you during the period of
2    supervised release.   With respect to those conditions imposed
3    upon you while you're on supervised release for five years, if
4    you feel that any of those are unreasonable, you have a right
5    to challenge that and appeal that, but I haven't ordered that
6    any conditions be imposed upon you that aren't imposed upon
7    anybody else that's convicted of a similar crime as this.

8            With respect to your right to appeal, there's a
9    ten-day time frame in the federal system to appeal.   That ten
10   days starts to run from the date that I sign the judgment, and
11   I'll sign the judgment today.   And Mr. Schmidt will be notified
12   of that, and he knows what needs to be done to protect your
13   right to appeal, but if you don't appeal within that ten days,
14   you lose that right to appeal forever.

15           But I will tell you that there was a provision and
16   there is a provision in your plea agreement where you waived or
17   you gave up that right to appeal as long as I sentenced you
18   within the advisory sentencing guideline range.   The advisory
19   sentencing guideline range in this case was 168 to 210 months.
20   You were sentenced below that.   You were sentenced to the
21   statutory maximum of 120 months, and that's the maximum that I
22   could sentence you to, but that's below the advisory guideline
23   range, so you have a right to appeal, but the Eighth Circuit
24   Court of Appeals traditionally dismisses appeals where there's
25   an appeal waiver in rather short opinions.   Do you have any

1   questions about your right to appeal?

2   THE DEFENDANT:   No.

3   THE COURT:   Do you have any questions about anything

4   that I've ordered here today?

5   THE DEFENDANT:   No.

6   THE COURT:   I would urge you to take advantage of the

7   programs available through the Bureau of Prisons, to get your

8   GED, to pursue further vocational or training or education

9   that's going to be made available to you there, to take

10   advantage of the drug treatment, alcohol treatment programs so

11   that you can hopefully put this behind you and do something

12   positive with your life from this experience, rather than make

13   it a negative one.

14   Any questions at all, sir, about anything that's been

15   ordered or done here today?

16   THE DEFENDANT:   (Shakes head.)

17   THE COURT:   You will get credit for the time that

18   you've been serving since you were arrested and held in custody

19   on this charge.   You'll be remanded back to the custody of the

20   U.S. marshals.   I would estimate that it will be about two

21   weeks before the Bureau of Prisons determines where you will be

22   placed.   Would you like me to recommend in my judgment that you

23   be placed as close to your home in North Dakota as possible, or

24   haven't you given that much thought?

25   THE DEFENDANT:   Yeah, I did, but I don't know.   Yeah.

1      THE COURT:  I will make that recommendation.

2  Unfortunately, we don't have a federal facility here in North

3  Dakota.   There are some in Minnesota.   There is one in South

4  Dakota, but there are no federal facilities in North Dakota.

5  Mr. Schmidt, anything else?

6      MR. SCHMIDT:  No, Your Honor.

7      THE COURT:  Mr. Volk?

8      MR. VOLK:  No, Your Honor.

9      THE COURT:  Was there a dismissal of certain counts

10  in this case that needs to be taken care of?

11      MR. VOLK:  Counts 1 through 4, Your Honor.  I will

12  file that electronically with the Court following the hearing.

13      THE COURT:  All right.  Mr. McGrath, anything else?

14      MR. McGRATH:  No, Your Honor.

15      THE COURT:  All right.  We will stand adjourned.

16      (Concluded at 11:26 a.m., the same day.)

17                - - - - - - - - - -

18

19

20

21

22

23

24

25

CERTIFICATE OF COURT REPORTER

I, Sandra E. Ehrmantraut, a Registered Professional Reporter,

DO HEREBY CERTIFY that I recorded in shorthand the foregoing proceedings had and made of record at the time and place hereinbefore indicated.

I DO HEREBY FURTHER CERTIFY that the foregoing typewritten pages contain an accurate transcript of my shorthand notes then and there taken.

Dated this 14th day of June, 2006.


_____
Sandra E. Ehrmantraut
Registered Professional Reporter